UNITED STATES, Appellee,

v.

Kesiena B. ESHALOMI, Private First Class U.S. Marine Corps, Appellant.

No. 49789.

NMCM 82–4599.

U.S. Court of Military Appeals.

Oct. 14, 1986.

For Appellant: *Lieutenant Roman A. Chojnacki*, JAGC, USNR (argued); *Lieutenant Colonel M. W. Lucas*, USMC and *Major Michael E. Canode*, USMC (on brief); *Lieutenant Commander Alvin L. McDonald*, JAGC, USN.

For Appellee: *Lieutenant Commander John B. Holt*, JAGC, USN (argued); *Captain W. J. Hughes*, JAGC, USN and *Captain David B. Stratton*, USMC (on brief); *Commander Richard A. Monteith*, JAGC, USN.

*Opinion of the Court*

EVERETT, Chief Judge:

Private First Class K. B. Eshalomi was tried at Camp Lejeune, North Carolina, by a general court-martial composed of officer members. Contrary to his pleas, he was found guilty of burglary, rape, assault with intent to commit sodomy, and indecent assault, in violation of Articles 129, 120, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 929, 920, and 934, respectively. These findings and his sentence to a dishonorable discharge, confinement for 30 years, forfeiture of all pay, and reduction to pay grade E-1 were approved by the convening authority. The United States Navy-Marine Corps Court of Military Review denied Eshalomi's petition for a new trial and later affirmed his conviction in a separate action. We then granted review to consider this issue:

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY RE-

VIEW ERRED WHEN IT DETERMINED THAT THE TRIAL COUNSEL'S DELIBERATE NON–DISCLOSURE OF: (1) THE VICTIM'S CIVILIAN MEDICAL RECORD WHICH REVEALED A PRIOR SEXUAL ASSAULT FOLLOWED BY TWO YEARS OF PSYCHIATRIC TREATMENT AND PSYCHOLOGICAL COUNSELING, AND (2) THE VICTIM'S 7 MAY STATEMENT WHICH CONTAINED A MAJOR INCONSISTENCY AND REVEALED A MAJOR OMISSION FROM HER TESTIMONY CONCERNING THE RAPE, HAD NO EFFECT ON THE OUTCOME OF THE TRIAL WHERE THE VICTIM WAS THE ONLY EYEWITNESS TO THE ALLEGED OFFENSES.

I

A

Mrs. Judy Clark testified that she lived with her husband, a Marine corporal, and their two small children at Camp Lejeune, North Carolina. In the early part of March 1981, she met appellant when she went to his house to see whether his wife wanted to buy any Avon products. Appellant "came to the door dressed in his [under]shorts" and said that his wife was not at home. Mrs. Clark then left her name, telephone number, and address on an Avon pamphlet for Eshalomi to give to his wife.

In April, appellant called Mrs. Clark's home about placing an order. Because she was not there, he left a message for her to call him back. Mrs. Clark later returned the call, and appellant placed an order. However, Mrs. Clark admitted that she and appellant also talked for about 20 to 30 minutes on a variety of subjects, including Eshalomi's accent, which he identified for her as Nigerian. Furthermore, according to Mrs. Clark, at the end of their conversation he asked her for a date; but she told him that she was a married woman and laughed off his invitation. Mrs. Clark testified that she had told her husband everything appellant had said during their conversation; and Corporal Clark admonished her not to take any more orders from him.

Eventually Corporal Clark picked up the deposit for the Avon order from appellant.

Mrs. Clark testified that several months later—on August 10th—while her husband was away at a military school and her two children were sleeping, she was awakened by some noise after she had fallen asleep on her couch in her living room while watching television. Thereupon, she saw two men coming through her back door; but before she could run to the backroom to get her pistol, the "shorter" man grabbed her and threw her on the lovechair in the living room. As she and he struggled, plants in the living room were knocked over. Their struggle continued into the kitchen, where some other items were knocked out of place. Then, after Mrs. Clark fell to the kitchen floor, the "shorter" man overcame her, got on top of her, and began ripping her nightgown and underpanties. She started screaming but stopped when he told her that he would make it difficult for her to breathe. At that point, he raped her.

As the "shorter" man was raping her, he was talking to her and, according to Mrs. Clark, had called her by her name. She recognized the voice and knew who the rapist was. Then he attempted to put his penis in her mouth; but she kept moving her head. Then "[h]e ejaculated on the side of my face."

During the attack on her, Mrs. Clark attempted to scratch her assailant; but she did not know whether, in fact, she had been successful in doing so. She also testified that she "grabbed his wrist watch, I don't know if I grabbed a watch or the cuff of his shirt or what, and he yanked it out [of] my hand." As to what the second or "tall guy" was doing "all this time," Mrs. Clark specifically testified that "[h]e was behind us, looking through the cabinets and everything, you could hear the rattle of cups and that sort of thing."

After the "shorter" man had sexuallv assaulted Mrs. Clark, the two men left her apartment, and "I just kept pacing around, I didn't know what to do." Eventually, she

went to the house of her next-door neighbors, the Serratos, and told them that two men had broken into her house and had raped her. Corporal Serrato went over to check her house to make sure the men were not still lurking there. Eventually, he called the military police.

After they arrived, Mrs. Clark was transported in an ambulance to the hospital and taken to the emergency room, where she was examined by a doctor and other medical staff personnel. Thereafter, she went to the Naval Investigative Service (NIS) and talked with Special Agent Robert Dillard. In a written, sworn statement she described both men but stated, "I have never seen them before." After she completed her statement, she and Dillard returned to her home. According to Mrs. Clark, at that time the telephone rang; and when she answered it, she could only hear heavy breathing. She immediately hung up the telephone. Thereafter, the telephone rang again and Special Agent Dillard answered the telephone; but no one said anything.

Mrs. Clark testified that the night after she was raped, she concluded that it was appellant who had raped her. On August 12, she provided a composite description of the two assailants. On August 14, she was shown six photographs and she picked out the picture of appellant as the man who had raped her.

Corporal Ruben Serrato testified that he had gone to sleep about 10:00 p.m.; but he was awakened between 2:00 and 3:00 a.m. by a banging on his front door. It was Mrs. Clark, and she was nervous, upset, and crying. She stated that two men had come into her house; and later she revealed that she had been raped. When he went over to her house to look around, he saw a watch on the floor by the kitchen stove and a broken bottle of vodka in the trash can. However, the back door to her house was completely shut. Serrato testified that Mrs. Clark had not wanted him to call the military police; but he called them

anyway, and they arrived at her house about 10 minutes later.

Mrs. Serrato reiterated her husband's testimony. However, she added that, "[w]hen she come to my house, all I seen, it was all torn and everything, and I seen the short pink night gown; it was all torn, she didn't have anything to cover up." Mrs. Serrato described the disarray in which she found Mrs. Clark's house. Also, she testified that, after Mrs. Clark's husband had left for training, she had not seen anyone unusual visiting Mrs. Clark.

Special Agent Dillard had gone to Mrs. Clark's house early in the morning of August 11, 1981. "She was very hysterical," and the house "was completely disarrayed." He found a wrist watch with a broken band. However, like Corporal Serrato, he did not detect any forced entry in either door to the house. He further testified that on August 11, Mrs. Clark had received two telephone calls. One of these she had answered, and the caller had hung up; and the other he had answered with a similar result. Dillard testified that Mrs. Clark told him that she could recognize her assailant but that she had not seen him before. Mrs. Clark also told him that, after her assailant had ejaculated, she had wiped herself off with a towel; and this towel was sent to the laboratory to be examined for semen.

On August 12, Special Agent Dillard met with Mrs. Clark's husband; and "[b]ased on the description that his wife gave me he said that he knew he thought he knew of an individual that fit that description. So he took me to PFC ESHALOMI's residence." On Friday, August 14, Dillard met twice with Eshalomi and had him photographed. At first, Eshalomi denied even knowing Mrs. Clark. However, when Agent Dillard asked him where his watch was and then told him that he had his watch, Eshalomi admitted that he knew her and that he had participated in sexual intercourse with her.[1]

---

1. Eshalomi told Agent Dillard that he had reached a climax and had ejaculated in a con-

dom; and he said that when he finished with the condom, he had put it in his pocket and had

Warrant Officer D. E. Veland, a forensic serologist, testified that he had performed a series of tests on a rape kit [2] submitted to him from the NIS at Camp Lejeune. He acknowledged that his laboratory findings had been inconclusive. Upon microscopic examination of Mrs. Clark's vaginal smear, semen was revealed; but his examination of the towel revealed no semen. Furthermore, when he examined Mrs. Clark's fingernail scrapings and clippings for the presence of blood, there was no indication thereof. However, he could not determine whether the lack of blood or body tissue in the fingernail scrapings would have indicated that Mrs. Clark had not used her fingernails to scratch anyone.

The stipulated testimony of Doctor Donald G. Bair, a gynecologist, was that on the morning of August 11, he had conducted a standard rape examination of Mrs. Judy Clark. She indicated to him that her assailant had put his penis in her vagina and then had withdrawn it and had put it in her face. However, she did not believe that the assailant had ejaculated in her vagina. She also told him that there had been no oral intercourse. A physical examination of Mrs. Clark revealed no fresh marks on her body, although she complained of soreness in her neck and right forearm as a result of the incident. Examination of her pelvic region also revealed no evidence of trauma or any abnormalities. When Dr. Bair examined microscopically a sample of the vaginal fluid, he observed two nonviable spermatozoa cells in the fluid. However, she reported sexual intercourse with her husband 10 days earlier, so he believed that the spermatozoa probably came from her husband, although they could have come from the pre-ejaculate fluid of the alleged assailant.

Testifying in his own behalf, Eshalomi confirmed Mrs. Clark's account of how

they initially had met and that he had called her and had placed an Avon order. However, appellant stated that he had never received his Avon order; and so on various occasions he had called her to inquire about it. During these calls, she became increasingly personal. In addition to discussing his foreign accent, the practice of voodoo in Africa, and the Nigerian custom of polygamy, she began to ask serious questions about his family. She also told him that her pelvic bone was very narrow, that she had had a Caesarean section for both of her children, and that the doctor had advised her not to have another child. According to Eshalomi, Mrs. Clark even told him that her doctor had given her a diaphragm to use. Furthermore, during one of their conversations, she appeared to have been keeping him on the telephone and had told him that she was lonely at home and that her husband was working from noon to midnight. She also had mentioned that Corporal Clark was scheduled to go away to school. Mrs. Clark told him that she had heard that many women come to his house to see him. He then explained the "operation" he performed on these women in his "workshop," and Mrs. Clark remarked, "Ain't that dirty?."

According to Eshalomi, Mrs. Clark then invited him over to watch television and to drink some of her husband's rum. She told him that Corporal Clark was away at school and that she was lonely. She further suggested that 10:00 p.m. would be a safe time to come over in order to avoid being seen by her neighbors. When appellant arrived at Mrs. Clark's house, she let him in through the front door. She asked him if anyone had seen him and he answered in the negative. She then offered him a seat, brought out a bottle of white rum that had already been opened, and drank a diet soda herself. They started dancing

thrown it in a sewer two or three blocks away. Subsequently, Dillard went to the sewer that appellant had pointed out; but he could not find the condom.

**2.** The rape kit consisted of several items to be examined for evidence of intercourse between

Mrs. Clark and appellant. These included a vaginal swab, vaginal smear, pubic combings, pubic hairs pulled for comparison purposes, head hairs, fingernail scrapings, cloths, and saliva stains.

very close together, began to kiss and caress, and, finally, had sexual intercourse—the affair lasting about 2 hours.

According to Eshalomi, he called Mrs. Clark the next day to apologize to her because he had promised her that he would be gentle, but he had been rough. She had been upset and, as a result, she had asked him to leave. During their conversation, Mrs. Clark finally suggested that he come over again that night. When he returned to her house that night, he came through the back porch, as she had instructed him to do. She asked him whether he had brought some condoms. The scenario of the previous evening was then repeated; but this time he used a condom, which he discarded in a sewer on the way home.

On August 10, appellant called Mrs. Clark; and she invited him to bring some of the photographs of his family and himself in tribal dress he had brought from Africa. Eshalomi testified that he entered her home about 10:00 or 11:00 p.m. through the front door. She served him the remaining rum; he showed her the African pictures; and they listened to music, danced, and had sexual intercourse. However, when he left that evening, he forgot his wrist watch, which was on a coffee table in front of the couch and television set. Also, appellant testified that the kitchen and living room had been in good general condition when he left; that he had no occasion to return to Mrs. Clark's quarters that evening or the following morning; that he had never entered her quarters without her permission; and that he had never gone to her house with any other individual.

According to Eshalomi, his next contact with Mrs. Clark had been on August 11, when he called during his lunch break to tell her that he wanted her to drop his wrist watch off in his mail box. However, when she came to the telephone, she kept on saying "hello," and hung up. He then waited a couple of minutes to call her back. The second time a man answered the telephone; and he immediately hung up, because he thought this was her husband. He denied that he had breathed heavily over the telephone or had said anything in an indecent way. He claimed that initially he had not told Special Agent Dillard that he knew Mrs. Clark or had intercourse with her, because he had not wanted to jeopardize her marriage.

Chief Warrant Officer Dalton Langlinais testified that for 16 months appellant had worked in his section and that they had had daily contact for 15 minutes to an hour per day. Based thereon, he had formed the opinion that appellant was a truthful person.

In rebuttal, the prosecution called Sergeant Isaiah B. Eddy, who lived two houses away from Mrs. Clark's house and had known the Clarks for about 6 months. According to Eddy, he washed his car every day between 7:00 and 9:00 p.m. and sometimes as late as 9:30. On the dates when Eshalomi claimed to have gone to her house, Eddy had not seen any males go there except for himself, Mrs. Serrato, and a paperboy. Because of the August heat, he had kept his doors and windows open at night and so had been able to hear Mrs. Clark open her door. However, on the nights when appellant claimed to have visited her, he had not heard anybody knock at her door or seen anyone go to her house.

### B

Before appellant's trial commenced, he made a series of requests for discovery of evidence. On September 4, 1981, his lawyers requested:

a. The statements or other papers held by the Government relevant to the pending charges;

\* \* \* \* \* \*

f. All medical reports and lab analyses pertaining to the victim, ... relevant to these charges.

\* \* \* \* \* \*

h. All other information relating to the case.

Also, on September 19, 1981, "the defense request[ed] immediate and timely access to":

a. All witnesses or potential witnesses who may be called at an Article 32 [UCMJ, 10 U.S.C. § 832] or subsequent [trial] proceeding;

b. All statements taken from these witnesses;

\* \* \* \* \* \*

f. All inclusive lists and any results of all tests performed on Mrs. CLARK to include rape kits, photographs, medical reports, psychiatric evaluations; ...

g. Copy of Mrs. CLARK's health record.

On September 28, 1981, at the Article 32 hearing, the defense made a request for witnesses which included Drs. C.M. Day, D.G. Bair, and S.V. Abdon. The request stated that their "testimony is material and relevant because" they were medical doctors stationed at Camp Lejeune and had "performed medical tests" upon Mrs. Clark "either on the day" of "the alleged rape or within" the next 5 days.

On September 30, 1981, the defense submitted a written request to take Mrs. Clark's deposition. In this particular request, the defense stated:

The points desired to be covered in the oral deposition are as follows: ...

\* \* \* \* \* \*

(e) The alleged suicide attempt by Judy Irene Clark on 16 August 1981.

(f) The psychiatric treatment of Mrs. Judy Irene Clark before and after 11 August 1981.

On October 2, 1981, Dr. K.D. Ragan, who was Mrs. Clark's civilian doctor in Pensacola, Florida, wrote the Commanding General at Camp Lejeune to advise that Mrs. Clark was "hospitalized at the West Florida Hospital with a diagnosis of major depressive episode." On October 7, 1981, the defense requested the presence of Dr. Ragan, among others, at the upcoming Article 32 hearing. In addition, "the defense request[ed] that all psychological and medical records of Mrs. Judy I. Clark in possession of the U. S. Government prior to Article 32 Investigation be released to the defense." Also, on January 28, 1982, the defense made a further request to depose Dr. Ragan and his associate, Dr. S.S. Brockway, concerning "procedures [they had] utilized during hypnotic sessions" they had conducted with Mrs. Clark.

Finally, on April 27, 1982, defense counsel stated that he had orally requested the assistant trial counsel to give him all statements made by Mrs. Clark or any of the other government witnesses. According to him, the assistant trial counsel had assured him that the Government did not possess any additional statements from Mrs. Clark at that time but that, if she did make any additional statements, they would be provided to the defense.

On May 7, 1982, Mrs. Clark made another statement to Special Agent Dillard in his office, after she had testified at appellant's trial and while the trial was still going on. In this statement—which trial counsel did not furnish to the defense—Mrs. Clark modified her previous trial testimony as follows:

The information that I am now providing pertains specifically to the second person involved in this incident. Everything that I have previously provided and reported is true and correct. *I have left some details out of my previous statements because I was very much afraid.* I was also scared because somehow the Lawyers (defense) made me feel as if I invited this humiliating experience upon myself.

When ESHALOMI finished he got up and I remained on the floor. I had my eyes closed and when I opened my eyes the other person was standing beside me. Because I had my eyes closed I thought they had left, I opened my eyes and I started backing up to the corner of the room. The other guy started unbuttoning his pants and I ask them to go, please leave me alone. I pleaded with them to go away. This other person said something to the effect "no now it was his turn." I had back myself into the corner and this person walked over to me and stood for a few moments and then got on his knees. This person then

pulled my hair and kept telling me not to mess up. This person then forced me to suck his penis by pulling my hair, he had a tight grip on my head. This person told me how nice it was *and he ejaculated in my mouth*. After ejaculating this person started to fasten his pants. He then got real close to me and told me "If I ever told anybody he would come after me". He also told me "that I have two nice looking kids", and he turned and left the room. ... *I went into the bathroom and I threw-up*, I kept brushing my teeth trying to clear my mouth out.... I then just sat on the couch for about an hour. I then decided I needed to talk to someone. I went to my next door neighbor, Carmen and Ruben SWAROTO (phonetic).

(Emphasis added.) Also, in this statement, Mrs. Clark recanted her earlier statement that, after she was raped, she had attempted to commit suicide by taking an overdose of pills. According to the later statement:

On 14 August 1981, after I had identified ESHALOMI as raping me at the NIS office, that night approximately 2000/2100 I was asleep on the couch and my husband was laying across the bed asleep, I had awaken and noticed the blinds open in the kitchen window. I went to close them and I could see out the window the second person who had raped me looking into the window. *I tried to wake up my husband but he was sound asleep*. I went back into the kitchen and I remembered that the doctor had told me that I could take 8 pills at once to calm myself. After seeing the second person I got upset again. Instead of taking 8 pills, I took the whole bottle. I stayed away from the window. I began to start feeling dirty and bad feelings because of what happened and I

then went to the bathroom to take a shower. I began to get hazy in the shower and that's the last thing that I remember.

(Emphasis added.)

Lt Col Hooper, the chief prosecutor in Eshalomi's case, admitted that when he found out about the statement, Eshalomi's trial was still underway.[3] However, he did not mention the statement to defense counsel until May 10, after the trial was over and Eshalomi had been sentenced by the court members.[4] Even then, when defense counsel requested a copy of the statement, the prosecutor refused to give it to him and instructed Agent Dillard not to release the statements.

The inability of the defense to procure a copy of Mrs. Clark's statement prompted them to contact her at her new residence in Pensacola, Florida. After discussing her statement, Mrs. Clark was mailed a written statement compiled from the defense counsel's notes and was requested to sign it, if she believed it fairly reflected her conversation with the defense counsel. She eventually signed the statement which stated, among other things:

I testified in the trial on Tuesday 4 May 1982. *At that time I knew other things about that night (10 August 1981) but I intentionally left those things out of my testimony....*

On the night of the alleged rape (Monday 10 August 1981), the second man did more than I have reported before. *The second man also raped me, after the first man. The second man also tried to force his penis into my mouth.* The second man also told me that if I ever identified him, he would come back and get me. He also made a comment about

---

3. The Court of Military Review found that Mrs. Clark made the May 7 statement "while the members were deliberating on findings" and that trial counsel learned of the statement on the same day. Unpub. op. at 2. Lt Col Hooper also acknowledged in one of his post-trial affidavits that he found out about the statement either "after findings had been announced or after deliberations had commenced."

4. Even then, Lt Col Hooper mentioned Mrs. Clark's May 7 statement only when he accosted defense counsel to inquire whether appellant might want to cooperate with the Government to identify and help convict the second man, who allegedly was his accomplice.

"two nice kids" which I took to be a threat against my children....

\*   \*   \*   \*   \*   \*

After I testified, I talked with Agent Dillard in his office. Again he showed me the photographs and asked me if I could recognize anyone. At first I could not. I did not want to point anyone out for two reasons: 1) the man had threatened me and 2) I was not exactly sure I could identify the right one and I did not want to pick the wrong person. I told Mr. DILLARD twice that I did not think I could identify anyone from the pictures. He seemed to get irritated when I said that. After thinking about it, I picked out someone that looked like the second man....

\*   \*   \*   \*   \*   \*

As far as the incident when I was twelve, I was repeatedly raped by a relative that I was living with. I ran away and returned to live with my father. I never reported the rapes to my family, the police, or anyone else. My father noticed a change in me and he sent me to a child psychologist for two years. This doctor used drugs and counseling to help me.

(Emphasis added.)

Because of Mrs. Clark's new statements, appellant moved before the Court of Military Review for a new trial. Thereafter, the respective parties filed with that court numerous post-trial affidavits offering additional details about Mrs. Clark's last statements.

Special Agent Dillard's affidavit explained that, after Mrs. Clark had testified against appellant and before his trial had ended, she came to his office. "Mrs. Clark was extremely nervous about the possibility that ESHALOMI might be found not guilty. As we talked, she became more and more nervous, suddenly blurting out that the second man had raped her also and had threatened her with harm to her children." (Emphasis added.)

Lt Col Hooper, the chief prosecutor, supplied two post-trial affidavits. As to Mrs. Clark's new allegation that the second man had also sexually assaulted her, he stated that "[e]ven though the statement's rendition of what the accomplice did on the night of the rape could be viewed as differing from what Mrs. CLARK said on the witness stand I remember at the time thinking that she had just not told all on the stand and thinking that what the accomplice did was essentially irrelevant to the ESHALOMI case." According to his affidavit, Hooper had believed that the criminal discovery rules only required him to give the defense "exculpatory" evidence; and the fact that Eshalomi's accomplice threatened Mrs. Clark and had also raped her hardly seemed exculpatory in Eshalomi's case. He also noted that, at the beginning of the trial, defense counsel had successfully moved *in limine* to "exclude [any] evidence of the mental problems that Mrs. CLARK" was experiencing "as a result of the rape"; and so Hooper did not think that the defense counsel would "find that Mrs. CLARK ingested too many pills after being threatened by ESHALOMI's accomplice by accident instead of on purpose of any use to" the defense. As to the new information that the second man had also sexually assaulted Mrs. Clark, the prosecutor stated that this could have enhanced her credibility, increased the members' sympathy for her, and put Eshalomi in a more unfavorable position. According to Hooper, if evidence had come in that she had stated that she also had been raped by the accomplice, this would have been devastating to Eshalomi's cause and would not have impaired the victim's credibility in the eyes of the court members.

Lt Col Hooper admitted in his post-trial affidavit that, before the trial began, Mrs. Clark had shown him some of her medical records, which had been prepared by Drs. Ragan and Brockway, her two civilian doctors in Pensacola. There were a dozen of these reports; and "[o]ne of the reports was a patient history which detailed an incestuous relationship which Mrs. CLARK had with, I believe, her older brother, when she was about 12 years old and stated that

she had received psychiatric treatment as a result of it."

Hooper did not show defense counsel the medical records, because Mrs. Clark "did not want anything brought out in court concerning her incestuous relationship with her brother . . . or the resulting psychiatric treatment." Moreover, he had advised Mrs. Clark that by reason of Mil.R.Evid. 412(b) and her Florida doctor-patient privilege, she did not have to reveal her "past sexual activities." Further explanations by Lt Col Hooper for not showing defense counsel Mrs. Clark's civilian medical records were that "there was never a request from the defense made to me or Mrs. CLARK that she waive her privilege and no request for medical records was ever made before the court"; that he was not the trial counsel in the case when the case first began and had not learned about the defense request for her medical records until September 14, 1982, while he was "reviewing the record of trial"; and that in any event, "[t]he defense knew that the records Mrs. CLARK brought to Camp Lejeune were in existence yet they never asked the court to enforce their discovery request."

In a post-trial affidavit filed by one of Eshalomi's defense counsel, he averred that on June 11, 1982, he called Dr. David Stagner, the military psychiatrist who had seen Mrs. Clark when she was admitted to the Naval Regional Medical Hospital at Camp Lejeune on August 16, 1981. Dr. Stagner told him that when he took a history from Mrs. Clark, she had not told him that she had previously been raped at age 12. However, "Dr. STAGNER stated that he asked about such events because they would be important for accurate diagnosis and treatment." Stagner said in his report on August 17 that he had diagnosed Mrs. Clark's drug overdose as a "Suicidal Gesture."

## C

In denying appellant's motion for a new trial based on the undisclosed information, the Court of Military Review stated its disagreement with the prosecutor's decision not to inform the defense immediately about Mrs. Clark's May 7 statement. Nevertheless, it determined "that, if the . . . statement . . . had been available to the defense for use in the cross-examination of Mrs. Clark . . . it would not have probably produced a substantially more favorable result for the petitioner." Unpublished Order dated August 18, 1983, p. 1. Therefore, the court concluded that a new trial was not warranted.

Subsequently, during its Article 66, UCMJ, 10 U.S.C. § 866, review of appellant's conviction, the Court of Military Review expounded further on the nondisclosure issue. At that point, appellate defense counsel had contended that the prosecutor "had two major items of information which he failed to disclose to the defense despite specific requests for discovery"—namely, (1) Mrs. Clark's "civilian medical records . . . which revealed a prior sexual assault followed by two years of psychiatric treatment and psychological counseling, and (2) her statement of 7 May . . . in which she stated that both men had raped her." Unpublished opinion (hereafter unpub. op.) at 3.

As to the former, the court found that "the records were arguably relevant and specifically requested" by defense counsel and that "trial counsel's deliberate nondisclosure of those records prior to trial was error." After observing that trial counsel's failure to reveal those records to the defense apparently had "been motivated by his sympathy for the victim and was in response to her request that they not be revealed," the court admonished that, "[i]f the trial counsel questioned the relevance of the civilian medical records and desired that they remain undisclosed, he should have sought the trial court's protection." Unpub. op. at 3.

As to Mrs. Clark's May 7 statement, the court determined that the defense had made "repeated specific requests . . . that *any* statement made by Mrs. [C] concerning the night of 10 August must be disclosed" and that the May 7 "statement was

unquestionably relevant and should have been immediately disclosed by the trial counsel while the court could still be re-opened." Furthermore, although her May 7 statement did not directly contradict any of Mrs. Clark's testimony about appellant's actions on the night of the rape, it contained "a *major* inconsistency from her prior statements (concerning the suicide attempt) and a *major* omission from her testimony (concerning the rape)." (Emphasis added.) Therefore, the prosecutor's non-disclosure of the May 7 statement also constituted error. Unpub. op. at 3.

In determining whether the two errors of prosecutorial nondisclosure required reversal of appellant's conviction, the court stated that "the standard ... [i]t must apply" was whether the "specifically requested" "undisclosed evidence *might* have affected the outcome of the trial." Unpub. op. at 3. However, the court stated that it was "convinced beyond a reasonable doubt of appellant's guilt" and was "convinced that the members would not have changed their verdict [even] if the additional information had been available to the defense." Unpub. op. at 4. The court explained:

> The connection which appellant attempts to make between the evidence of the prior sexual assault of Mrs. [C] (and ensuing psychiatric care) and her perception or credibility is much too tenuous and speculative to convince us that it could have influenced the result at trial even if the pertinent medical records had been made available to the defense and had been ruled admissible (a questionable prospect under the provisions of Rule 412, MIL.R.EVID.). Furthermore, we are convinced that the 7 May statement of Mrs. [C] which contained no contradictions specifically regarding appellant's actions but only added to the severity of the offenses committed by appellant's accomplice, would not have affected the decision of the members. In fact, the statement tends to aggravate these already egregious offenses, and, because of the inflammatory nature of the information contained therein, we have doubts

that the defense would even have wanted to use it to cross-examine Mrs. [C.]. Unpub. op. at 3-4. Moreover, according to the court, appellant's testimony was "inherently incredible," and his version of what happened was "ridiculous on its face." Unpub. op. at 4.

Appellant now claims that the court erroneously determined that the nondisclosure did not require reversal of his conviction. He submits that the sole issue before the trial court was whether the sexual activity between appellant and Mrs. Clark was consensual and that, as Mrs. Clark was the only prosecution witness on this issue, her credibility was of paramount importance. He argues that trial counsel's action in deliberately withholding information concerning the alleged victim's medical and psychological history and her May 7 statement greatly impeded the ability of defense counsel to impeach Mrs. Clark and probably affected the outcome of his trial. In his view, because prosecutorial nondisclosure of requested information prevented defense counsel from fulfilling their responsibility to represent him, he was denied a fair trial. We agree.

## II

### A

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution.*" *Id.* at 87, 83 S.Ct. at 1196. (Emphasis added.) Thus, regardless of the good faith reflected by Lt Col Hooper's explanations for not disclosing information to the defense, the only issue here is the materiality of the nondisclosed evidence.

In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 40 L.Ed.2d 342 (1976), the Supreme Court provided guidance for determining the materiality of undisclosed information. Three separate factual situa-

tions of prosecutorial nondisclosure were described and a different standard was prescribed for each situation. *See also United States v. Brickey*, 16 M.J. 258 (C.M.A. 1983). In the first situation a prosecution witness had given "perjured testimony and ... the prosecution knew, or should have known, of the perjury." There "a conviction [so] obtained ... is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103, 96 S. Ct. at 2397 (footnotes omitted). As *Agurs* explained, this "strict standard of materiality" is applied "not just because ... prosecutorial misconduct" is involved but, more important, because of "corruption of the truth-seeking function of the trial process." 427 U.S. at 104, 96 S. Ct. at 2397. Typical of this situation are *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

The second scenario involves "a pretrial [defense] request for" a specific item of exculpatory evidence or information and failure or refusal of the prosecutor to grant the request. *Brady* itself was such a situation, for the defense counsel had unsuccessfully requested the pretrial statements of defendant's accomplice. As the Court explained in *Agurs:* "In *Brady*, the request was specific [because] [i]t gave the prosecutor notice of exactly what the defense desired." 427 U.S. at 106, 96 S.Ct. at 2398. In determining the materiality of evidence specifically requested, an appellate court must determine whether "the suppressed evidence might have affected the outcome of the trial." 427 U.S. at 104, 96 S.Ct. at 2398. In *Brady*, the undisclosed information would not have affected the conviction, which was affirmed. However, it might have affected the decision at trial to impose a death sentence; and so the Supreme Court agreed that resentencing was required.

■ The third situation exists when, as in *Agurs*, the defense has made no specific request for a particular item of undisclosed evidence or has made only a general request for exculpatory evidence or information. In that event, the prosecutor's failure in his duty to provide the defense with exculpatory evidence is reversible error only

> if the omitted evidence creates a reasonable doubt that did not otherwise exist ... This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

427 U.S. at 112–13, 96 S. Ct. at 2401–2402 (footnote omitted), *quoted in United States v. Valenzuela-Bernal*, 458 U.S. 858, 868, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982).

■ Recently, in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court dealt with prosecutorial failure to disclose requested impeachment evidence.[5] The Court of Appeals for the Ninth Circuit had expressed the view that "failure to disclose impeachment evidence is 'even more egregious' than failure to disclose exculpatory evidence 'because it threatens the defendant's right to confront adverse witnesses.'" 105 S.Ct. at 3380, 87 L.Ed.2d at 490. Accordingly, "the Government's failure to disclose requested impeachment evidence that the defense could use to conduct an effective cross-examination of important prosecution witnesses constitutes ' "consti-

---

**5.** The request was for "the prior criminal records of [government] witnesses, and any deals, promises or inducements made to witnesses in exchange for their testimony." 105 S.Ct. 3375, 3377 (1985). The undisclosed evidence consisted of contracts whereunder two undercover agents would be paid for testifying.

tutional error of the first magnitude' " requiring automatic reversal."

Disagreeing with the court below, the Supreme Court "rejected any ... distinction between impeachment evidence and exculpatory evidence." According to the opinion of the Court, [6] "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." 473 U.S. at ——, 105 S.Ct. at 3381, 87 L.Ed.2d at 491.

In the portion of his opinion in which only Justice O'Connor concurred, Justice Blackmun discussed the three situations described in *Agurs. See* 473 U.S. at —— - ——, 105 S.Ct. at 3382–83, 87 L.Ed.2d 491–95. Where the prosecution has knowingly used perjured testimony, the materiality standard is whether the nondisclosure was "harmless beyond reasonable doubt." The justification for applying this strict standard is "that the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves 'a corruption of the truth-seeking function of the trial process.' " 105 S.Ct. at 3382.

In all other cases—whether they involved no request for evidence, a general request, or a specific request—the Court would apply a more lenient test. Thereunder, the inquiry must be whether, if the evidence had been disclosed, the probability of a different outcome is sufficient "to undermine confidence in the" trial results. 105 S.Ct. at 3384.

Even under Justice Blackmun's view, a specific request for undisclosed evidence bolsters the defense case, because

an incomplete response to a specific request not only deprives the defense of certain evidence, but has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies

that it otherwise would have pursued.... And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

105 S.Ct. at 3384.

Justice White—writing for himself, Chief Justice Burger, and Justice Rehnquist—accepted the reasonable-probability standard but found it unnecessary "to elaborate on the relevance to the inquiry of the specificity of the defense's request for disclosure, either generally or with respect to this case." 105 S.Ct. at 3385.

Justice Marshall's dissent, in which Justice Brennan joined, complains that the Supreme Court was defining the right to disclosure "not by reference to the possible usefulness of the particular evidence in preparing and presenting the case, but retrospectively, by reference to the likely effect the evidence will have on the outcome of the trial." 105 S.Ct. at 3392. He feared that, under the Court's standard of reasonable-probability, often prosecutors would withhold evidence:

The Court's standard also encourages the prosecutor to assume the role of the jury, and to decide whether certain evidence will make a difference. In our system of justice, that decision properly and wholly belongs to the jury. The prosecutor, convinced of the guilt of the defendant and of the truthfulness of his witnesses, may all too easily view as irrelevant or unpersuasive evidence that draws his own judgments into question. Accordingly he will decide the evidence need not be disclosed. But the ideally neutral trier of fact, who approaches the case from a wholly different perspective, is by the prosecutor's decision denied the opportunity to consider the evidence. The reviewing court, faced with a verdict

---

**6.** A majority concurred in part, but not in all, of Justice Blackmun's "opinion of the Court." However, a majority did join in the portion of

the opinion prescribing the test of materiality quoted here.

of guilty, evidence to support that verdict, and pressures, again understandable, to finalize criminal judgments, is in little better position to review the withheld evidence than the prosecutor.

105 S.Ct. at 3394.

Justice Stevens, dissenting, agreed in many respects with Justice Marshall.[7] He would apply a more liberal standard of materiality where the prosecutor had failed to disclose information specifically requested by the defense. In such cases he would reverse if "there is 'any reasonable likelihood' that" the undisclosed evidence "could have affected the judgment of the trier of fact." 105 S.Ct. at 3399. Apparently, Justice Stevens would use the majority's reasonable-probability standard only in cases where the defense had made no specific request for the undisclosed evidence.

## B

Although *Bagley* may prescribe the minimal constitutional requirements of disclosure,[8] it does not prevent Congress or the President from prescribing higher standards for courts-martial. As we read Article 46 of the Uniform Code, 10 U.S.C. § 846—which was enacted when discovery for defendants was almost nonexistent in state and federal criminal trials—Congress intended more generous discovery to be available for military accused. Indeed, as we interpret this article, defense counsel have been denied "equal opportunity to obtain witnesses and other evidence" if a trial counsel unilaterally and without court approval denies a defense request for statements or records in his possession.

Article 46 contemplates that the President would promulgate regulations providing the defense with the required "equal opportunity." Consistent with this man-

date, *see also* Art. 36, UCMJ, 10 U.S.C. § 836, the President has made generous provision for discovery by the accused in trials by court-martial. This was true under the Manual for Courts-Martial (1969), which applied to appellant's trial. *See* paras. 34, 44*h*, and 115*c*, Manual for Courts-Martial, United States, 1969 (Revised edition). It is even truer today. *See* R.C.M. 701(a)(1)(C), Manual for Courts-Martial, United States, 1984.[9] One justification for the liberal military discovery practice is:

Providing broad discovery at an early stage reduces pretrial motions practice and surprise and delay at trial. It leads to better informed judgments about the merits of the case and encourages early decisions concerning withdrawal of charges, motions, pleas, and composition of court-martial. In short, experience has shown that broad discovery contributes substantially to the truthfinding process and to the efficiency with which it functions. It is essential to the administration of military justice; because assembling the military judge, counsel, members, accused, and witnesses is frequently costly and time consuming, clarification or resolution of matters before trial is essential.

App. 21, Analysis to R.C.M. 701.

In view of the statutory and Manual provisions for discovery, it might be argued that, when defense-requested information is withheld by the prosecution, we should impose a heavier burden on the Government to sustain a conviction than is constitutionally required by *Bagley*. However, we need not face that issue now because, even under the reasonable-probability test, reversal is required in this case.

## C

As the staff judge advocate recognized in his review, several reasons existed

---

**7.** Justice Powell did not participate in the decision.

**8.** We are not fully convinced that the majority in *Bagley* intended to authorize a prosecutor to withhold requested information if he believed there was no reasonable probability its nondisclosure would undermine confidence in the trial results. The issue before the Court was the

effect of nondisclosure in deciding whether to reverse a conviction, rather than the propriety of the prosecutor's action.

**9.** Faithful to codal and Manual provisions, this Court has also liberally interpreted the requirements for discovery. *See, e.g., United States v. Killebrew,* 9 M.J. 154 (C.M.A.1980).

to doubt whether Mrs. Clark had been truthful in accusing appellant of rape. Shortly after the incident, a physical examination conducted on her revealed no bruises or abrasions on her body or any other evidence of trauma, even though she claimed that she had struggled with the rapist. She told Agent Dillard that appellant had ejaculated in her face after she was raped and that she had wiped off the semen with a towel; but the laboratory analysis of the towel showed no traces of semen. Furthermore, the absence of blood or body tissues from the finger scrapings indicated that she probably had not scratched the alleged assailant.

None of Mrs. Clark's next-door neighbors heard any scream; and after the rape she delayed in going to her next-door neighbors and telling them that she had been raped. When she finally did so, no one who came to her house saw any sign of forced entry. However, as the staff judge advocate also observed in his review, Eshalomi had a great amount of very intimate information about Mrs. Clark—such as that she had delivered her two children by Caesarean section. This knowledge tended to corroborate appellant's version of events—that they were having an affair.

We perceive several ways in which the undisclosed evidence might have diminished Mrs. Clark's credibility and thereby tipped the scales in favor of the defense. Her undisclosed May 7 statement and civilian medical records showed that she had lied repeatedly about important matters—at least twice while under oath. For example, when during her testimony at appellant's trial she was asked where was the second man while appellant was raping her, she replied that "[h]e was behind us, looking through the cabinets and everything, you could hear the rattle of cups and that sort of thing." However, in her statement of May 7, she stated that the second man had sodomized her and had ejaculated in her mouth. Then, in the June 17 statement to defense counsel, she asserted that the second man "tried to force his penis into" her mouth; and for the first time she

claimed that "[t]he second man also raped me, after the first man."

In the undisclosed May 7 statement, Mrs. Clark stated that on August 14, 1981, she had seen through her window the second man who had raped her. She then remembered that a doctor had told her that she could take eight pills at once to calm herself; but instead of taking eight pills, she took the whole bottle for this purpose. Thereafter she started to feel dirty and bad because of what had happened; she went into the bathroom to take a shower; and she became dizzy in the shower—that being the last thing she remembered.

However, in the statement given to her psychiatrist, Doctor Stagner, on August 17, 1981, only two days after taking the overdose of pills, her account was altogether different:

She was initially relieved at the arrival of her husband, but noted that there was something different in the relationship and felt a sense of estrangement from him not previously noted. Three days following the event she began to have an impulse to take a mild sedative prescribed by the obstetrician. She voiced this to her husband, they discussed it, and she did not take the medication. Four days following the event, while in the Office of the Naval Investigative Service, she identified one suspect. This led to uncontrollable crying and request for an emergency psychiatric evaluation. This was accomplished in the Emergency Room of the Naval Regional Medical Center, and she, along with her husband, were seen for approximately one hour. At that time, she revealed a sense of alienation, mild suicidal ideation, concerns about her and her husband's relationship, and the willingness to work with the psychiatrist. She was given Mellaril 25 to 50 mg three times a day and Dalamane 30 mg a day (one week's supply of each), a number whereby she could contact a psychiatrist at any time over the weekend, and an appointment to see a psychiatrist at 0830, 17 August 1981. On the night prior to her appoint-

ment, she reportedly told her husband the details of the rape. She perceived his response as one of bewilderment, uncertainty and an inability to know what to do for her; she reacted to this by an extreme sense of alienation and aloneness followed by a one hour period of extreme ambivalence as to whether she should or should not take her life. During this time, she heard the voice of her conscience out loud in her head telling her that she was bad and should end her life. She took the Mellaril, laid down, and her husband soon realized what she had done. She was brought to the Emergency Room, evaluated, and admitted to the Psychiatry Service for further observation and treatment.

The discrepancy between these statements could have aided the defense in showing that Mrs. Clark was unreliable. However, the prosecutor's nondisclosure to the defense of evidence contradicting Mrs. Clark's initial statement that she had made a suicidal attempt was especially significant because of its ultimate impact on the defense trial tactics.

In an Article 39(a) session the defense raised a question about the reliability of some of the information provided by Mrs. Clark because it had been forthcoming after she had been hypnotized by Dr. Brockway, her civilian physician in Florida. The judge ruled that he would not allow the defense to introduce expert testimony about the reliability of hypnotically induced testimony but he would allow the defense to bring out evidence that some details had not been provided by Mrs. Clark until after she had been hypnotized.[10]

Later in the same Article 39(a) session, the defense moved "*in limine* ... to prohibit mention" of "the ... psychiatric care ... received by Mrs. Clark after the incident" and, "in particular, the alleged suicide gesture that was made by Mrs. CLARK within a week or 10 days after the incident." The defense claimed that such

evidence would be "more prejudicial than it is probative, and ... would serve nothing more than to arouse sympathy and attempt to, you know, make her more credible by saying that she did this as a result of the incident." Trial counsel responded that "[s]he is going to testify that as a result of the rape that she tried committing suicide twice, and that she was under severe—or suffering from a severe mental illness as a result of this rape." He contended that this evidence was admissible on the merits because it was consistent with the behavior of a woman who had been raped and so corroborated her testimony. Moreover, the prosecutor argued that "we can't have the members hear that she was hypnotized without having them know why she was hypnotized." Ultimately the judge ruled that the evidence of the suicide attempt and the treatment would only be admissible "if her credibility is attacked." So long as her credibility was not attacked, this potentially damaging evidence would not be received.

When Mrs. Clark testified, the defense did not ask her about any statements made under hypnosis. Indeed, the cross-examination stayed within the bounds prescribed by the military judge and did not attack her credibility—even though the credibility of her testimony that she had consented was a principal issue in the case. In light of the defense's original intent to offer evidence that some of the detailed information supplied by Mrs. Clark had been elicited by hypnosis, it seems clear that this line of inquiry was abandoned, rather than risk the prosecution's introduction of evidence about the "suicide attempt." Obviously the defense options would have seemed quite different if the defense counsel had been aware that, according to Mrs. Clark's later statement, there had been *no* suicide attempt. Of course, we do not know how the members of the court-martial would have evaluated evidence that some of her testimony recited information elicited un-

10. Apparently the military judge drew a distinction between information elicited by therapeutic hypnosis and that induced by hypnosis performed by law-enforcement agents. Also, he was concerned about getting too involved in "a collateral issue."

der hypnosis; but we cannot discount the possibility that the result would have been an impairment of her credibility.

A similar analysis can be made with respect to the civilian health records which contained Mrs. Clark's history of being raped by her brother when she was 12 and then for 2 years receiving counseling and medical treatment for emotional problems caused by the rape. Of course, this history was inconsistent with the information provided by Mrs. Clark when she was medically examined on August 11, 1981, for an alleged sexual assault. At that time she answered "no" to the questions, "Has patient ever been raped before?" and does patient have "[a]ny history of emotional illness?" When Mrs. Clark was interviewed on August 17 by Dr. Stagner, the base psychiatrist, she denied a history of past psychiatric difficulty. Moreover, while under oath during the Article 32 hearing, she replied in the negative when defense counsel asked, "Other than my client here today, have you ever accused anyone of any type of rape or sexual assault?" [11]

Once again the inconsistencies tend to impair Mrs. Clark's credibility, although perhaps she and trial counsel could have explained them as being only the result of her reluctance to bring to light unpleasant events from the distant past. Of greater importance may be the effect of the nondisclosure on defense trial tactics. As noted earlier, the military judge ruled that, if the defense attacked Mrs. Clark's credibility, then the Government could present evidence as to her "suicide attempt" and psychiatric treatment after the incident. Just as this prospect would have been less threatening if the defense had known that no suicide attempt had been made, so, too,

defense counsel might have concluded that evidence about the treatment would be less damaging to their cause if the factfinder knew that Mrs. Clark had previously undergone 2 years of psychiatric treatment when she was a girl. Thus, the defense might have been willing to open some doors they left closed at trial.

Furthermore, if the defense had known of Mrs. Clark's history of rape by her brother, they might have conducted additional investigation prior to trial. For one thing, they might have sought to determine if there were elements of fantasy in her account of the rape by her brother and the extensive treatment therefor. If she fantasized as to this matter when providing a medical history to her own doctors, it would be difficult to give much credence to her account of being raped by appellant.

On the other hand, if the childhood rape had occurred, the relevance to her credibility also is great. Appellate defense counsel have called to our attention psychiatric literature concerning the traumatic effects of childhood incest or rape.[12] It is clear from this literature that in the view of many psychiatrists these childhood events might be very important in evaluating the reliability of a claim of rape later in life. Indeed, one obvious reason why doctors ask alleged victims of sexual assault about any prior attacks is to determine the reliability of the allegations.

In his opinion in *Bagley*, Justice Blackmun cautioned that an incomplete response to a defense request for evidence has the effect of misrepresenting that evidence does not exist, and in reliance thereon "the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued."

**11.** In his affidavit, Lt Col Hooper indicated a belief that the information about the alleged rape of Mrs. Clark by her brother was shielded by Mil.R.Evid. 412. We disagree. In any event, the scope of this Rule or any asserted patient-physician privilege should be determined by a court—not *ex parte* by the prosecutor.

**12.** *See* M. de Young, *The Sexual Victimization of Children* 46, 131 (1982); Lewis and Sarrel, *Some Psychological Aspects of Seduction, Incest, and Rape in Childhood,* 8 J. Child Psychiatry 606 (1969). Apparently, rape and incest in childhood may have many different effects on the victim's later personality. For example, they may lead to promiscuity or to misinterpretation of subsequent sexual experiences and encounters.

We are convinced that the nondisclosure had that effect in this case and that the defense—if not dissuaded by the implicit prosecutorial misrepresentation—would have prepared and presented its case quite differently.

In that event, we are satisfied that the outcome of this trial would probably have been different, for in our view the evidence was far more evenly balanced and appellant's account far less "incredible" than the Court of Military Review concluded. Indeed, if trial counsel had made available the civilian medical records of Mrs. Clark prior to trial, it is even conceivable that the defense could have produced evidence which might have persuaded the convening authority not to go forward with a trial.[13] Under these circumstances, the nondisclosure is clearly sufficient to undermine any confidence in the findings of guilty. Accordingly, the findings of guilty cannot stand.

### III

The decision of the United States Navy-Marine Corps Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Judge SULLIVAN did not participate.

COX, Judge (concurring):

I concur. The United States Navy-Marine Corps Court of Military Review found that trial counsel's nondisclosure to the accused of this rape victim's medical and psychological records and the victim's post-trial statements made during deliberations constituted error. Unpub. op. at 3, *citing Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Webster*, 1 M.J. 216 (C.M.A.1975). The Court of Military Review concluded that the error would not have affected the outcome of the trial and affirmed. Unpub. op. at 4. My review of the record of trial leads me to the same conclusion that Chief Judge Everett reaches. Accordingly, I join him in reversing the decision of the court below.

Although the post-trial statements made by the victim were inculpatory rather than exculpatory, the startling difference between the two versions of what happened on the night in question raises doubts as to the general believability of the witness. This information *may* have created a reasonable doubt about the accused's guilt.

If the Government receives information during the trial that a witness has changed his testimony after having testified, I would require the Government to disclose the change to the accused and to the military judge. If the discovery occurs prior to announcement of the sentence and if the accused so moves, the military judge has the option of reopening the trial for the purpose of presenting the evidence to the court-martial. In considering the motion, I would adopt the same test that is used to determine if a new trial would be warranted by the discovery of new evidence. "[T]he newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." Para. 109*d* (2)(c), Manual for Courts-Martial, United States, 1969 (Revised edition). *See* R.C.M. 1210(f)(2)(C), Manual for Courts-Martial, United States, 1984. *See also* R.C.M. 1210(f)(3). Of course, the military judge has broad discretion to "permit a party to reopen its case" in the interest of justice. *See* R.C.M. 913(c)(5).

---

**13.** That possibility is heightened by the circumstance that, prior to trial, Eshalomi had passed a lie detector test. Regardless of the admissibility of this evidence—an issue hotly contested at trial—it could properly be considered by the convening authority in the exercise of his pre-trial or post-trial discretion. *See United States v. Carr*, 18 M.J. 297, 302 (C.M.A.1984).