UNITED STATES, Appellee

v.

Clifford C. MEADOWS, Jr.,
Staff Sergeant, U.S. Air
Force, Appellant.

No. 93–1334.
CMR No. 29778.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 8, 1994.

Decided June 12, 1995.

Certiorari Denied Oct. 2, 1995.

See 116 S.Ct. 190.

For Appellant: *Lieutenant Colonel Joseph L. Heimann* (argued); *Colonel Jay L. Cohen* (on brief); *Lieutenant Colonel Frank J. Spinner, Lieutenant Colonel G. Michael Lennon* (USAFR), *Major George F. May, Captain J. Knight Champion, III.*

For Appellee: *Major Jules D. Silberberg* (argued); *Colonel Jeffery T. Infelise* and *Major John H. Kongable* (on brief).

### Opinion of the Court

WISS, Judge:

1. At a general court-martial convened at Royal Air Force Mildenhall, United Kingdom, appellant pleaded not guilty to charges that he had stolen $1,600.00 from the United States; that he had tried to impede an investigation by threatening a witness; and that he had solicited yet another witness to make a false official statement. *See* Arts. 121 and 134, Uniform Code of Military Justice, 10 USC §§ 921 and 934, respectively. Ultimately, the members found appellant not guilty of threatening a witness but convicted him of the remaining charges and sentenced him to a bad-conduct discharge, confinement for 6 months, a fine of $3,200.00, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review[1] affirmed them in an unpublished opinion.

2. On appellant's petition, this Court granted review of the following issue:

WHETHER THE GOVERNMENT'S USE AT TRIAL OF A LEASE AGREEMENT WHICH DIFFERED FROM THAT WHICH HAD BEEN OFFERED DURING THE ARTICLE 32[, UCMJ, 10 USC § 832] INVESTIGATION UNFAIRLY MISLED THE DEFENSE AND THEREBY DENIED APPELLANT A FAIR OPPORTUNITY TO PRESENT A DEFENSE.

Now, after full consideration of the arguments and the record, we are convinced beyond a reasonable doubt that any latent error in trial counsel's not providing the defense with the version of the lease agreement that the prosecution offered into evidence at trial did not affect the results of the case. *See United States v. Green*, 37 MJ 88 (CMA 1993);[2] *see also United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

I

3. In September 1990, appellant met Wendy Watson, a widow with 3 children who lived at 12 Adeane Meadow in Mundford, England. The two dated steadily over the next several months; in fact, in October, appellant began spending up to three nights a week with Ms. Watson at her home.

4. In December appellant proposed to Ms. Watson, and the relationship continued to blossom: Appellant still spent several nights a week with Ms. Watson (between three and five nights, depending upon whose testimony is believed); he participated to some extent in her family's activities; they commingled funds even to the point of jointly buying a German car and bringing it back to England; and they made plans for eventual travel of the five of them to the United States once the couple married.

5. The storytale eventually ended, however, when Ms. Watson learned in June 1991 that appellant had been spending time with Wendy Nutt—the mother of appellant's two children—on the nights when he was not with her. Ms. Watson testified that appel-

---

1. *See* 41 MJ 213, 229 n. * (1994).

2. There, the majority opined:

   We have considered that, in the military, there may be "a heavier burden on the Government" than that imposed upon civilian prosecutors "to sustain a conviction" when evidence has been withheld from an accused. *United States v. Eshalomi, supra* [23 MJ 12] at 24 [(CMA 1986)]. This heavier burden springs from the generous discovery principle announced in Article 46, UCMJ, 10 USC § 846. *Id.* Thus, when we apply the "materiality" test, we give the benefit of any reasonable doubt to the military accused. If we have a "reasonable doubt" as to whether the result of the proceeding would have been different, we grant relief. *United States v. Watson, supra* [31 MJ 49] at 55 [(CMA 1990)]. If, however, we are satisfied that the outcome would not be affected by the new evidence, we would affirm. 37 MJ at 90.

lant had told her that, on those nights, he stayed in a dorm room that he was able to use because he knew the dorm manager.

6. In the meantime, appellant had hit a financial bump in the road in December 1990. He and another servicemember jointly owned a house in Lakenheath; but the latter moved pursuant to permanent-change-of-station orders in December, and he left under circumstances in which it was clear that he would send no more mortgage money to appellant.

7. Unable to make the payments himself, appellant decided to rent the house out. Ultimately, in January 1991, he did so to a couple named Wickam for a monthly rental of £325. The lease agreement listed Ms. Watson as landlord in order to facilitate her collection of the rent on appellant's behalf if ever necessary. In fact, Ms. Watson apparently did collect the rent herself one month and receipted for the rent on that occasion as well as one other.

8. Also in January, appellant signed a fill-in-the-blanks tenancy agreement to rent Ms. Watson's house at 12 Adeane Meadow, Mundford. Under the terms of that agreement, appellant was to pay Ms. Watson £325 per month for a period of 6 months, and the agreement recited that a security deposit of £325 had changed hands. Although the agreement provided (¶ 1.0) that "[t]he Landlord lets and the Tenant takes the property" on the 17th of January, Ms. Watson and her children continued to live in the house.

9. One other critical event occurred that month. On January 22, 1991, appellant executed a form by which he requested payment from the United States of Overseas Housing Allowance (OHA). OHA is offered to servicemembers stationed overseas who do not live in base housing in order to subsidize the cost of their housing in the local community. On that form, appellant indicated that his address was "12 Adeane Meadow, Mundford," and that he "LEASED/RENTED" the premises for the monthly amount of £325. He indicated also that he paid for water or sewer and that no one else lived there who paid any "PORTION OF THE RENT, MORTGAGE, AND/OR UTILITIES."

10. At trial, Ms. Watson testified that, in fact, appellant never paid her any rent, any of the utilities, or the security deposit. Rather, she indicated, appellant stayed there several nights a week (and, in fact, apparently had moved in some belongings in January) simply incident to their growing relationship. She stated that she had signed the lease with appellant because the latter had indicated to her that he needed an address for roster purposes if he were to deploy under Operation Desert Shield. She denied having any knowledge at all that appellant had submitted claims for OHA until June 1991; when she did learn that appellant apparently had used her to get money to which he was not entitled, she reported him to American military authorities.

11. For his part, appellant swore that his lease arrangement with Ms. Watson was bona fide and that his request for OHA equally was on the up-and-up. He stated that their understanding was that she would "invest" the monthly rental of £325 in his house in Lakenheath because that was to become their common property once married. He theorized that his arrangement was no different from one in which he literally would hand Ms. Watson the rental money and she, in turn, would hand the same money back to him as an investment in his house—although she would be free at any time to *not* return the money, since it would be hers to do with as she pleased. He suggested that Ms. Watson's motivation to report him and to testify as she did rested, first, on her status as a woman scorned and, second, on the risk that she would be required to return previously paid government pensions and entitlements and that future payments would not be made if the social security administration learned the true nature of her lease agreement with appellant.

12. The lease agreement for the rental of Ms. Watson's house, which underpinned appellant's claim for OHA, was offered and admitted as prosecution exhibit (pros. ex.) 2 during the testimony of Ms. Watson. Indisputably, it is signed by both appellant and

Ms. Watson. Who filled in the various blanks in the agreement—including the amount of rental—however, was in dispute.[3] The following exchange occurred during cross-examination of Ms. Watson by defense counsel:

Q. And, there were a lot of blanks on both of those forms [the 5–page agreement and two more pages of property inventory] that had to be filled in?

A. Yes.

Q. And ma'am, you are the person who actually filled in each and every one of those blanks except for Sergeant Meadows' signature, correct?

A. Yes. Ah—

Q. Correct?

A. Yes.

Q. So, you're the one who wrote in the amount of rent that was due?

A. I'd have to see it.

Q. Would it help you to look at it?

A. Yeah, I'll have to see it to know.

DC: I'm now handing the witness Prosecution Exhibit # 2.

Wit: No, this is not my writing here.

Q. The second page, ma'am?

A. Okay, Yes.

Q. So, that's your writing where it says the amount of rent for the month per month?

A. No, that is not my writing.

Q. That's not your writing?

A. That is Cliff's [appellant's] writing. That is not my writing.

Q. That's not yours?

A. No.

The reason for defense counsel's apparent surprise at this testimony immediately became clear from the following:

Q. So, if you said at an earlier Article 32 hearing that you were the one who wrote in the amount for the rent, that would have been incorrect?

A. Having looked at that, that is not my writing.

Q. Notwithstanding your claim now, Miss Watson, you were present when this was filled out in its entirety?

A. Yes.

Q. And, you signed the end of it?

A. Yes.

13. Appellant's view as to who filled in these blanks came out in the course of his direct testimony explaining his version of their lease arrangement, as follows:

Q. Now, Sergeant Meadows, from the beginning, from the start of your lease with Miss Watson, was the plan to use your rent money to help cover the mortgage on the Lakenheath home?

A. Yes, sir.

Q. Was that something that you had discussed with Miss Watson?

A. Yes, sir.

Q. Was that something that she was fully aware of?

A. Yes, sir.

Q. What was her position in that regard?

A. Well, she saw it as a way to help us out when we got married. If we lost the house then we'd be in debt when we got married and that would be no good.

Q. So, she was fully aware of this arrangement?

A. Yes, sir.

Q. She consented to it?

A. Yes, sir.

Q. Did you have to threaten her or force her in any way to participate in this arrangement?

A. No, sir.

Q. Now, Miss Watson said she was the one who actually filled out the information on the form?

A. Yes, sir.

---

**3.** It is not altogether clear why this might have been of interest to the defense. In this Court, he argues that Ms. Watson's completion of the form was "[i]n support of [his trial] theory" that he "and Mrs. Watson were living together as common-law man and wife" and that "[t]his status made it understandable why, despite the exis-

tence of a lease for the payment of rent, rent in fact did not actually change hands but only constructively changed hands." Final Brief at 7. It is not immediately apparent, however, how it is probative of their alleged common-law status that Ms. Watson, as opposed to appellant, filled in the blanks on the form-lease.

Q. Was she the one that entered the amount on the form, or was that you?

A. She did.

Q. She did?

A. Yes, sir.

Q. So, that's her writing on that lease?

A. Yes, sir.

14. Sometime after trial, defense counsel discovered the underlying reason for the unexpected controversy over who had entered the data on pros. ex. 2: The form lease offered and admitted at trial as pros. ex. 2—which Ms. Watson, upon specific questioning, swore was filled in by appellant, not her—was *not* the same document that had been admitted at the hearing under Article 32 as investigating officer's exhibit (IO ex.) 3—which Ms. Watson then had acknowledged had been filled in by her. Unfortunately, if trial counsel personally was aware of this difference,[4] he never bothered to advise the defense; and for his part, defense counsel had no reason to suspect such a switch and so never noticed it during its handling of pros. ex. 2.[5]

## II

15. Beginning with his post-trial submissions to the convening authority and continuing through his appeal in this Court, appellant has cried foul. There is no doubt that the substance of each entry on pros. ex. 2 is identical to its counterpart on IO ex. 3 used at the Article 32 hearing, though the handwriting appears to be different. Further, there was no dispute at trial that, regardless who actually filled in the blanks, both appellant and Ms. Watson were aware of the information reflected by those entries, and it would appear from the trial record of trial

and the signatures of appellant and Ms. Watson that each signed both documents.

16. Nonetheless, appellant asserts that the prosecution failed to meet its discovery responsibility of informing the defense of the existence of a second original of the lease. He claims that this failure led the defense to serenely seek to establish in front of the members—with surprising and embarrassing lack of success—what Ms. Watson openly had acknowledged at the Article 32 hearing, *viz.*, that she had filled in the form. Appellant contends that this public failing somehow undermined his theory that she had fabricated her version of their arrangement and, as well, needlessly brought into question the credibility of his testimony that she, not he, had filled in the blanks.

## A

17. Suppression by the prosecution of evidence requested by the defense and favorable to an accused violates the accused's constitutional right to due process. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Where such a failure has occurred, reversal is mandated when the information that was not disclosed is "material." *United States v. Bagley*, 473 U.S. at 669, 105 S.Ct. at 3377. Thus, any analysis of a claimed failure in the prosecution's constitutional duty to disclose requested evidence to the defense must address two issues: First, was the evidence "favorable to the accused" in any way;[6] second, was the evidence "material"—that is, is there

a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

---

4. Trial counsel did not represent the United States at the Article 32, UCMJ, 10 USC § 832, hearing; another lawyer appeared in that capacity. *See* RCM 405(d)(3)(A), Manual for Courts-Martial, United States, 1984.

5. The completed form-lease admitted into evidence at the Article 32 hearing clearly is marked "IO EX 3" in the lower right corner, as would be expected. The substantively identical document that was admitted into evidence at trial is equally clearly marked "Pros. Ex. 2" in the lower right corner. Neither party in this Court has offered

any explanation for how trial counsel could have assembled his documentary evidence without noticing that the lease in his packet did not reflect the "IO EX 3" marking, or for how defense counsel could have handled that same document during his examination of Ms. Watson and appellant and not noticed the same omission.

6. Other than evidence favorable to the accused, the Supreme Court has swept only impeachment evidence within the *Brady* protection. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

different[?] A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 682, 105 S.Ct. at 3383.

18. We do not have to reach this constitutional question in this case, however. This Court has recognized that the statutory and implemental regulatory discovery rights of a military accused are more generous than the constitutional discovery rights of his civilian counterpart. *See, e.g., United States v. Simmons*, 38 MJ 376 (CMA 1993); *United States v. Green*, 37 MJ 88 (CMA 1993); *United States v. Eshalomi*, 23 MJ 12 (CMA 1986). Accordingly, appellant's interests are fully protected by limiting the scope of our analysis to such non-constitutional bases.

### B

19. Article 46, UCMJ, 10 USC § 846, admonishes that "[t]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." Pursuant to this statutory grant of authority, the President has promulgated RCM 701, *Manual for Courts–Martial, United States*, 1984. Among other provisions in this extensive general rule of discovery, RCM 701(a)(2) requires the Government, "upon request of the defense," to

> permit the defense to inspect:
>
> (A) Any books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, which are within the possession, custody, or control of military authorities, and which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial, or were obtained from or belong to the accused[.]

■ 20. As generous as this rule is, however, by its own terms it is triggered only by a defense request for such access. Curiously, at a time when it has appeared to be rather commonplace for defense counsel to file broad, blanket requests for such material, no such request is contained in this rec-

ord. Of course, we have no knowledge whether such a request may have been routinely exchanged between defense and trial counsel and simply was not included in the record. If so, however, it was incumbent upon the defense, who became aware of this issue and raised it only for the first time post-trial, to ensure that a copy of any such request appropriately made its way before proper authorities. It has not done so.

■ 21. In addition to the general discovery provisions of RCM 701, other Rules for Courts–Martial and Military Rules of Evidence, Manual, *supra*, "concern disclosure of other specific matters." RCM 701(a)(6), Discussion. For instance, RCM 405 concerns the pretrial investigation required by Article 32 of the Code. RCM 405(g)(1)(B) directs that "evidence, including documents or physical evidence, which is under the control of the Government and which is relevant to the investigation and not cumulative shall be produced if reasonably available." In turn, RCM 405(j)(3) directs that a copy of the investigating officer's report be delivered to the accused, and RCM 405(j)(2)(C) provides that one of the required components of that report be any document considered as evidence by the investigating officer.

22. Under this rule, the report delivered to appellant presumably contained a copy of the version of the lease agreement that was used during the pretrial investigation as IO ex. 3—the version that Ms. Watson had acknowledged filling in herself. It surely is clear from the record of trial that defense counsel knew not only of that document but also of Ms. Watson's acknowledged role in preparing it. Further, assuming compliance with RCM 405(g)(1)(B), counsel for the United States at the Article 32 investigation hearing was unaware of the duplicate original that ultimately appeared as pros. ex. 2, else it would have been produced at that hearing.

23. Somehow and for some reason unknown to this Court, the document that was tendered as pros. ex. 2 was exchanged for the one that the prosecution had used at the Article 32 investigation hearing. It is not clear how pros. ex. 2 came into the hands of

the prosecution or how, why, or with whose knowledge the exchange occurred. It is clear only that it did happen. In light of our ultimate disposition, *infra*, we need not consider whether the fact that the substitution occurred without furnishing a copy of the different version to the accused is consistent with the spirit and purpose of the assurances made by RCM 405(j)(2)(C) and (3). *See generally* RCM 701(d)("If, before or during the court-martial, a party discovers additional evidence or material previously requested or required to be produced, which is subject to discovery or inspection under this rule, that party shall promptly notify the other party or the military judge of the existence of the additional evidence or material.").

24. In the end, we are convinced beyond a reasonable doubt that these events did not affect the results of the proceeding. *See generally United States v. Green, supra.* The defense theory of the case squarely was presented to the members, and the critical issue was defined precisely for them by the evidence and by the closing argument of both counsel: What was the intent of appellant and Ms. Watson when they executed their leasehold arrangement? That there *was* a lease and that both parties *signed* it and *knew what was in it* bore directly on this issue and was not contested by the parties.

25. Who did the scrivening on the lease form, however, was of scant relevance to this issue. So scant, in fact, that it was not even mentioned by trial counsel in his closing argument that is reported in over 8 1/2 singled-spaced-typed pages of the record; was barely mentioned only once in a passing reference by defense counsel in his closing argument covering 8 more pages; and was not mentioned by trial counsel in his rebuttal argument that is reported in over 2 additional pages of the record. So scant, as well, that the differences between Ms. Watson and appellant on the question assuredly received little attention from the members, either as direct evidence or as relating to credibility.

26. We cannot conclude this opinion, however, without at least passing reference to the fact that, while defense counsel may have been surprised by the existence of pros. ex. 2, appellant himself surely was not. As pointed out earlier, both appellant and Ms. Watson signed both versions of the lease and, therefore, appellant could not have been ignorant of the existence, somewhere, of this second document. We have little patience, generally, with appellate calls for a penalty flag from an accused who, when all is said and done, was mugged—if at all—largely by his own lack of candor with his counsel. *See generally United States v. Powell,* 40 MJ 1 (CMA 1994); *United States v. Smith,* 35 MJ 138 (CMA 1992).

### III

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.