UNITED STATES

v.

Claire S. SEBRING, 256–49–8582, Ocean Systems Technician (Maintainer) Third Class (E–4), U.S. Navy.

NMCM 94 01991.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 4 Aug. 1994.

Decided 15 Oct. 1996.

LT Gerard Wm. Wittstadt, Jr., JAGC, USNR, Appellate Defense Counsel.

LCDR John R. Livingston, Jr., JAGC, USN, Appellate Government Counsel.

Before DOMBROSKI, C.J., LUCAS, J., and KEATING, Senior Judge.

KEATING, Senior Judge:

This case is before us for review under Article 66, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 866, and as a petition for a new trial filed pursuant to Article 73, UCMJ, 10 U.S.C. § 873, based on newly-discovered evidence concerning quality control problems at the Navy Drug Screening Laboratory, Norfolk, Virginia. At oral argument, we specified the issue of whether the Government violated appellant's due process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to disclose evidence favorable to the defense. We conclude that the appellant was denied a fair trial for that reason and set aside the findings of guilty and the sentence. A rehearing may be ordered.

### The Trial

Appellant was tried by a special court-martial of officer members for a single charge and specification of wrongful use of marijuana. She was found guilty, contrary to her pleas, and was sentenced to a bad-conduct discharge and reduction to pay grade E-1. The convening authority approved the sentence. The Government's evidence consisted of live testimony and a stipulation of expected testimony that random drug testing of appellant's unit was done on the date in question, that she was included in the testing, and that her sample tested positive for the active metabolite of marijuana.

The defense case consisted of testimony that the appellant lost track of her sample bottle while assisting another person who became severely ill during the random drug testing; that this disruption lasted for 15 or 20 minutes; that the appellant was a good worker who was actively seeking to get pregnant and thought she was at the time, and that the appellant did not use marijuana then or ever and was very careful about using any drugs because of her belief that she was pregnant.

The defense argued appellant's sample had been contaminated by someone who took advantage of her distraction when she put her sample bottle down to assist the sick person. The defense did not attack the drug laboratory's results, conceding the testing program was generally a good system. The Government argued the collection was properly done and only appellant testified that the unit's sample bottles were not under close custody at all times.

### Expert Witness Testimony

The Government called the executive officer of the drug screening laboratory as an expert witness. He testified as to the methods by which urine samples were tested in the laboratory, what the results had been with regard to the sample identified as the appellant's, and what those results meant, i.e., that the sample contained the active metabolite of marijuana, the presence of which means that marijuana was ingested.

He also testified as to quality control procedures used by the lab and that all controls were met in this case and said that the reliability of Navy drug screening laboratories is "incredibly high. If you will, you would say like 99.9999 point accuracy." Record at 77. He described the internal controls at the laboratory and how quality was also monitored by the Armed Forces Institute of Pathology. He said the use of radioimmunoassay and gas chromatography mass spectrometry and the selective ion mode resulted in 99.99 percent accuracy. Record at 78.

He described in detail the quality control procedures used both internally and by the Armed Forces Institute of Pathology and the three other sources of quality control inspection: the Bureau of Medicine and Surgery every quarter; the Chief of Naval Operations quality assurance and training team; and semi-annually the Department of Health and Human Services. He also testified that a scientist from the Department of Defense came once a year to independently inspect the laboratory.

On cross examination, the executive officer was asked if he was testifying that mistakes are never made at the Navy drug laboratory.

A. No, I'm not saying that. Mistakes have occurred, only that they're caught and then tests are being repeated.

Q. Because mistakes are made you have to do the test, is that correct?

A. No, it's a procedural requirement. The three test is a procedural requirement, when you do a review of a certain test, if it is not scientifically value [sic] then you do a repeat. Let's just assume that the person did not follow the standard operational procedure.

Q. This would be for any person at the lab?

A. Yes. Let's just assume that that person did that, then we would have to repeat the test because if you didn't follow procedure we have this blind quality control that will indicate otherwise, test results are not acceptable.

Record at 81.

Additional questions were asked about the handling of test samples and the possibility of contamination due to human error. The witness was not asked about, and he did not volunteer, the fact that 3 weeks prior to trial the commanding officer of the laboratory had issued a report concerning quality control problems at the laboratory. *See* enclosure (1) to appellant's petition for new trial, Commanding Officer, Navy Drug Screening Laboratory, Norfolk, VA, letter serial 12736, 09A/173 of 12 July 1994.

### The Missing Evidence

Unknown to the defense at the time of the trial, the drug screening laboratory that provided the test results had just completed an internal investigation that disclosed "data alteration" had occurred at the laboratory over a 6–month period from 22 October 1993 to 6 May 1994. The data alteration occurred over such an extended time because equipment software that should have detected that alterations had occurred was not working properly. Appellant's urine specimen was tested on 10, 14 and 16 September 1993, 1 month prior to the period covered by the report.

The report was not disclosed to the defense counsel notwithstanding a discovery request that asked for all quality control program reports and records of incidents of employee errors, negligence and misconduct in processing urine samples. The Government asserts trial counsel never received a copy of the report nor did he even know of its existence. The commanding officer of the Navy activity that did the drug test upon which the Government's case is based and, presumably, his executive officer who testified at trial for the Government, were well aware of its existence.

### The Constitutional Standard

The Supreme Court has held "suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). With regard to impeachment evidence, the Supreme Court has rejected any distinction between it and exculpatory evidence, holding that a constitutional error occurs, and the conviction must be reversed, if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial. *United States v. Bagley,* 473 U.S. 667, 715, 105 S.Ct. 3375, 3400, 87 L.Ed.2d 481 (1985), *cert. denied,* 488 U.S. 924, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988).

### The Military Standard

The Court of Appeals for the Armed Forces has held that although *Bagley* may prescribe the minimal constitutional requirements of disclosure, it does not prevent Con-

gress or the President from prescribing higher standards. *United States v. Eshalomi*, 23 M.J. 12, 24 (C.M.A.1986). The Court observed that under Article 46, UCMJ, Congress intended more generous discovery to be available for military accused and that the Government's burden may be heavier than is constitutionally required by *Bagley. Id.*

■ More recently, the highest military court has held that when it applies the "materiality" test of *Bagley,* it gives the benefit of any reasonable doubt to the military accused. *United States v. Green,* 37 M.J. 88, 90 (C.M.A.1993). Thus, if there is a "reasonable doubt" as to whether the result of the proceeding would have been different, the Court will grant relief. *Id.* The rationale for imposing the heavier burden on the Government is based on the generous discovery principle announced in Article 46, UCMJ. *See also United States v. Meadows,* 42 M.J. 132 (1995), *cert. denied,* — U.S. —, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995).

### Trial Counsel's Duty Of Due Diligence

■ The Court of Appeals for the Armed Forces has also held that "when results or reports of military scientific tests or experiments are.requested by the defense, such a request cannot be satisfied by making available for inspection only those reports *within the possession, custody, or control of trial counsel.*" *United States v. Simmons,* 38 M.J. 376, 381 (C.M.A.1993)(emphasis in original). This is so notwithstanding the language in R.C.M. 701(a)(6) that says the trial counsel has a duty to disclose only evidence *known to the trial counsel,* because of the broader duty imposed by R.C.M. 701(a)(2)(B) to discover scientific tests or experiments within the control of military authorities, the existence of which may become known to the trial counsel *by the exercise of due diligence. Simmons,* 38 M.J. at 381.[1]

Most recently, the Supreme Court addressed the question of favorable evidence not disclosed to the prosecutor until after the trial. The Court held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* — U.S. —, —, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995). To excuse a prosecutor from disclosing what he does not happen to know about would "substitute the police for the prosecutor, and even the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Kyles,* at —, 115 S.Ct. at 1568.

■ We believe the trial counsel's obligation to search for favorable evidence known to others acting on the Government's behalf in the case extends to a laboratory that conducts tests to determine the presence of controlled substances for the Government. Intermediate Federal courts have found a duty on the part of prosecutors to search for *Brady* information in files outside the prosecutor's office. *See, e.g., United States v. Brooks,* 966 F.2d 1500 (D.C.Cir. 1992). Clearly a Navy drug testing laboratory is "acting on the government's behalf" when it does forensic urinalysis testing. Therefore, the trial counsel is responsible for ensuring disclosure of *Brady* material held by such a laboratory.

■ Thus, we conclude that not only is *Simmons* still good law, but that under the recent Supreme Court decision in *Kyles* the trial counsel's duty of due diligence extends to all *Brady* evidence, not just to R.C.M. 701(a)(2)(B) material, notwithstanding the Manual language therein and in R.C.M. 701(a)(6) purporting to limit the duty of disclosure to evidence known to the trial counsel. The questions remaining, then, are whether the evidence that was not disclosed was favorable to the accused in any way and

---

1. We note the 1994 and 1995 editions of the Manual for Courts–Martial have deleted from R.C.M. 701(a)(2)(B) the words "or by the exercise of due diligence may become known." The phrase was in the 1984 version of the Manual in use at the time this case was tried, however, we are concerned about the deletion since we are unable to find its source in any of the "histori-cal" Executive Orders reprinted in the current edition of the Manual or as they were originally published in the Federal Register and are now compiled in supplements to Title 3 of the *Code of Federal Regulations.* Contents of the Federal Register and of the *Code of Federal Regulations* are *prima facie* evidence of the text of the original documents (44 U.S.C. § 1510).

"is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985).

### Quality Control Information As Impeachment

■ The discovery request the defense submitted in this case specifically asked for results of any "inspections, examinations, validations, or other verification" of the drug laboratory quality control program, as well as any records showing problems involving laboratory equipment and employee errors, negligence and misconduct. We consider drug laboratory quality control information to fall within the broad category of "scientific tests or experiments" covered by R.C.M. 701(a)(2)(B).

To hold otherwise would draw an artificial line between those scientific tests that are themselves direct evidence, such as drug test results for the presence of prohibited substances, and those tests that are conducted for quality control purposes and upon which the scientific validity of the former depends. When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility is error under *Brady*. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

### Materiality Under *Brady*

In *Kyles*, —— U.S. at ——, 115 S.Ct. at 1565, the Supreme Court last year clarified the application of *United States v. Bagley* in determining materiality for *Brady* purposes. Under the *Bagley* standard, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

However, the Court emphasized this does not mean that disclosure of the suppressed evidence would have resulted in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, —— U.S. at ——, 115 S.Ct. at 1566.

■ The test is not one of sufficiency of evidence or whether there would have been enough evidence left to convict, but whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Id.* Once a *Bagley* error is found, there is no need for further harmless error review because such an error necessarily must have had " 'substantial and injurious effect or influence in determining the jury's verdict.' " (Citing *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)(quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946))). Finally, the Court stressed that the analysis focuses on the cumulative effect of the undisclosed evidence, not item by item. *Kyles*, —— U.S. at ——, 115 S.Ct. at 1567.

### Application To The Facts Of This Case

The Supreme Court applied the facts to the law in Part IV of *Kyles, Id.* at ———— ——, 115 S.Ct. at 1569–76, and determined disclosure of the suppressed evidence to competent counsel would have:

(a) Resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense.

(b) Raised opportunities to attack not only the probative value of crucial physical evidence, but the thoroughness and even good faith of the investigation.

(c) Allowed the defense to question the probative value of certain crucial physical evidence.

The Court further noted that the remaining physical evidence, not directly undercut, would hardly amount to overwhelming proof of guilt. The Court concluded a different result was "reasonably probable" and reversed. *Kyles*, —— U.S. at ———— ——, 115 S.Ct. at 1569–76.

■ Applying the law to the facts of this case, we find that evidence of quality control problems at the drug laboratory could tend to impeach the scientific reliability of the laboratory and thus the probative value of the crucial drug test results. In the hands of competent counsel such evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

## Conclusion

We do not conclude, and we need not determine, whether the undisclosed evidence of quality control problems would necessarily have resulted in a finding of not guilty in this case. The test is not one of sufficiency of the evidence. We conclude only that, because the Government suppressed material evidence favorable to the appellant, appellant did not receive a fair trial, meaning a trial resulting in a verdict worthy of confidence.

Accordingly, the findings of guilty and the sentence are set aside. A rehearing may be ordered by the same or a different convening authority.

Chief Judge DOMBROSKI and Judge LUCAS concur.