**UNITED STATES, Appellee**

v.

**Derrell A. CHRISTY, Staff Sergeant
U.S. Air Force, Appellant.**

No. 96–0713.
Crim.App. No. 31200.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 3, 1996.

Decided March 10, 1997.

Certiorari Denied June 23, 1997.

See 117 S.Ct. 2484.

For Appellant: *Major Gerald R. Bruce* (argued); *Colonel David W. Madsen* and *Captain Harold M. Vaught* (on brief); *Colonel Jay L. Cohen* and *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Captain Libby A. Brown* (argued); *Colonel Theodore J. Fink* and *Lieutenant Colonel Michael J. Breslin* (on brief).

## Opinion of the Court

CRAWFORD, Judge:

Contrary to his pleas, appellant was found guilty of the unpremeditated murder of his wife, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. The convening authority approved the sentence of a dishonorable discharge, 35 years' confinement, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and the sentence after a hearing on the issue of ineffectiveness of counsel was conducted pursuant to *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967).

We granted review on the following issue:

WHETHER APPELLANT WAS DE-NIED HIS RIGHT TO THE EFFEC-TIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL DEFENSE COUN-SEL, AFTER INFORMING THE MEM-BERS THAT THEY WERE GOING TO PRESENT EVIDENCE OF THE AP-PELLANT'S PEACEFUL, LAW–ABID-ING NATURE AND GOOD MILITARY CHARACTER, AND ESTABLISH THE SUICIDAL TENDENCIES OF LORI CHRISTY THROUGH THE EXPERT TESTIMONY OF DR. RAISANI, NONE-THELESS FAILED TO PRESENT ANY SUCH EVIDENCE ON THE BASIS THAT THERE "WAS NO DEFENSE IN THIS CASE."

We hold that appellant was not prejudiced by any of the alleged errors.

## FACTS

Lori Christy was found dead from a shotgun wound on May 10, 1993. The weapon was found next to her body. What appeared to be a suicide note was found in a computer hutch in the Christy home. The day before her death, Lori Christy had threatened to commit suicide by ingesting Flexeril pills.

Investigating officials surmised that Lori Christy's death was not a suicide when they discovered that someone had ejected both the spent shotgun shell and a live shell from the gun and then had reinserted the spent shell into the gun. The live shotgun shell was found on the floor between Lori Christy's feet.

Within the next two months, events led police to the conclusion that appellant was responsible for his wife's death. On May 12, 1993, appellant signed a sworn statement in which he stated that he had visited two friends during the time frame in which his wife died. Appellant "helped" investigators by suggesting possible suspects. On May 28, he suggested that his wife and another woman might have had a suicide pact (thus explaining the two shells). On June 2, appellant called investigators and told them that his oldest daughter believed a friend of Lori Christy's had killed her. On June 17 and 18, appellant again told investigators that he was not present when his wife died.

Then, during an interview on July 8, appellant asked investigators whether his wife's mouth and eyes were open when her body was found. Appellant had not been allowed to view the crime scene or photos of the scene. At that time, investigators became convinced that appellant knew more about his wife's death than he was telling. Appellant explained to investigators that he returned to his home and found his wife in the basement trying to pull the trigger of the shotgun with her toe. He told investigators that the gun fired when he tried to grab it away from her.

On July 10, 1993, appellant changed his story again. Appellant claimed that he returned to the house and argued with Lori Christy, that she threatened to commit suicide, and that he called her bluff by retrieving the shotgun shells and the shotgun for her. Appellant told investigators that Lori Christy then tried to pull the trigger with her toe, that he grabbed the gun away from

her, and that the gun fired. According to this statement, appellant realized the spent shell had ejected from the gun. He put the shell back and placed the gun next to his dead wife. He then left the house and attended his daughters' school program.

On July 13, appellant gave a somewhat different version of the story to investigators. In this statement, appellant informed investigators that he now remembered loading the shotgun shells into the gun. Also, he remembered that his wife had held on to the barrel of the gun and his thumb hit the trigger of the shotgun as he was pulling it away from her.

There was other damaging evidence against appellant as well. Specifically, Lori Christy told appellant on the day she died that she was having an affair and that she was leaving him. Appellant felt "good" and "happier" after his wife's death. Five unfired shotgun shells were found in appellant's trash. An expert at trial testified that if appellant had accidentally pulled the six and a half pound trigger with his thumb while pulling the gun away from Lori Christy, he would most likely have severely damaged or broken his thumb when the gun recoiled.

There was also testimony at trial that Lori Christy was not suicidal on the day of her death. She had agreed the evening before that suicide was selfish. She had made plans to go to Virginia with a friend. An alarm was set in the Christy bedroom for 6:45 p.m., the time Lori Christy was supposed to leave to attend her daughters' school program.

Appellant's actions after Lori Christy's death were perhaps the most damaging to his case. Appellant altered the scene so that it would appear that Lori Christy had committed suicide. He placed the gun by his wife's body, straightened the body, replaced the spent shell in the shotgun, and put a ladder in front of his closet so that it would appear that the 5'1" Lori Christy could reach the shotgun shells.

At appellant's trial, defense counsel stated the following during opening arguments:

Now, the evidence in this case will show that Lori Christy was a very troubled young woman.... You will also hear evidence of her suicidal tendencies.... You will also hear evidence about the mental therapy that Lori was undergoing, as well as some of the things she wrote as part of her therapy....

In addition, you will see a note that was found after Lori's body was discovered. And Colonel Raisani, an Air Force forensic psychiatrist, will testify that this note was, in fact, a suicide note....

\* \* \*

Finally, you will hear evidence and see evidence of Sergeant Christy's good military character and that he has never been in trouble before.

Despite these assertions, trial defense counsel did not call any witnesses. In its case in chief, the prosecution introduced the alleged suicide note into evidence and also elicited testimony regarding Lori Christy's suicidal state the day before her death. Trial defense counsel introduced appellant's military record into evidence during the sentencing phase of the trial but did not call any character witnesses.

## DISCUSSION

■ The Sixth Amendment guarantees a criminal defendant "Assistance of Counsel for his defence." This Court has unanimously adopted the test for ineffective assistance of counsel established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See United States v. Ingham,* 42 MJ 218, 223 (1995).

*Strickland* creates a two-prong test to determine whether an accused was denied effective assistance of counsel. The first prong is whether counsel's conduct "fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. at 2064. We "strongly presume[ ]" that counsel has provided "adequate assistance." *Id.* at 690, 104 S.Ct. at 2066.

■ The second prong is whether there was prejudice. *Id.* at 692, 104 S.Ct. at 2067. An appellant who alleges prejudice *must* show that "counsel's errors were so serious

as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. As the Supreme Court noted in *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993)(footnote omitted):

> [A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

■ An analysis of this case under the first prong of *Strickland* reveals some unsettling circumstances. As we stated in *United States v. Fluellen,* 40 MJ 96, 98 (1994), "It is important for counsel to evaluate all of the evidence and determine the strategy that is most likely to be successful." Prior to trial, counsel should decide, as a tactical matter, "which witnesses not to call because of their potential for impeachment and corroboration of the prosecution's case." *Id.* Opening statements are a "critical part of the trial.... It is during the opening statement that the parties set forth their theory and theme of the case." *United States v. Turner,* 39 MJ 259, 265 (CMA 1994). While unexpected events at trial may lead to changed circumstances or different trial tactics, there is no indication of such unexpected events in appellant's case.

Trial defense counsel should have realized the tactical risks and benefits of calling Dr. Raisani and character witnesses well before they presented the defense's opening statement. The character witnesses may have been particularly important to appellant's defense because evidence of appellant's good military character may be sufficient to raise a reasonable doubt as to appellant's guilt, thereby bolstering appellant's accident defense. *See United States v. Breeding,* 44 MJ 345 (1996), and cases cited therein. However, we do not need to decide whether defense counsel's conduct fell below an objective standard of reasonableness because it is clear that appellant was not prejudiced by the conduct of his trial defense counsel.

■ Appellant made numerous incriminating and contradictory statements to the police. He informed his defense counsel that he was not at the house when his wife died, despite the three detailed statements to the police in which he admitted that he was present. Defense counsel had their hands tied. Had they put appellant on the stand, the members would have been even more skeptical of appellant's ever-changing stories. Appellant's statements significantly strengthened the case against him because they indicated guilt. "We have little patience, generally, with appellate calls for a penalty flag from an accused who, when all is said and done, was mugged—if at all—largely by his own lack of candor with his counsel." *United States v. Meadows,* 42 MJ 132, 138 (1995).

The Government's case against appellant was very strong. Appellant lied to investigators. Appellant tried to make Lori Christy's death look like a suicide. Appellant misled investigators by suggesting that another person had killed his wife. There was evidence of appellant's anger at Lori Christy. Appellant did not appear upset when he arrived at his daughters' school program after his wife's death, and he felt "good" and "happier" after his wife died. Further, appellant admitted that he retrieved the gun and shells, and admitted that he loaded the gun. An expert testified that if things had occurred as appellant claimed, appellant would most likely have severely damaged or broken his thumb when the gun recoiled. In sum, appellant's actions before and after Lori Christy's death provide ample evidence that the results of the trial were reliable.

Appellant's trial was not fundamentally unfair. *See Strickland, supra* at 668, 104 S.Ct. at 2052; *United States v. MacCulloch,* 40 MJ 236 (CMA 1994).

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges GIERKE and EFFRON concur.

SULLIVAN, Judge (concurring in the result):

The majority appears to resolve this claim of ineffective assistance of counsel on the basis of the strength of the Government's case. 46 MJ at 50. However, I agree with the appellate court below and its initial approach to this claim, which focuses on the reasonableness of defense counsel's conduct in the context of the entire trial. It said:

> This leaves two issues in need of further comment. First, in their opening statement counsel did, indeed, promise to put on Col (Dr.) Raisani, who had reviewed the results of the sanity board, and who would have testified as to his conclusion that Lori was genuinely suicidal at the time of her death. Defense counsel explained at the *DuBay* hearing that it was their belief that, as the government's case-in-chief unfolded, there was more than ample evidence of this, including the testimony as to the Flexeril pills and the suicide note. They were concerned that cross-examination of Dr. Raisani might well have produced adverse testimony, including the disclosure that appellant had told the sanity board that he was *not* in the house, and that, at least part of what may have contributed to Lori's suicidal ideation was appellant's having recently attempted to force her to participate in anal sex. In addition, under the accident theory of the case, it was essentially conceded that Lori

had not, in fact, committed suicide. While not as inevitable as, say, the decision to go with the accident defense, not appearing to unnecessarily denigrate a murder victim is entirely defensible. The military judge, after conducting an exhaustive post-trial hearing, found that this decision was fully discussed with appellant, and he agreed to it. Under the circumstances, therefore, it was well within the deference we afford defense counsel in the conduct of a trial. *See United States v. Brothers*, 30 MJ 289, 291 (CMA 1990).

> The decision not to put on any favorable character testimony following the government's case in chief was also not unreasonable. Counsel knew that "did you know, have you heard" questions, including the allegation of forced anal sex, appellant's expression of satisfaction to the AFOSI after his wife's death, his feeling of "arrogance" when he saw Jeanette at the auditorium in the immediate aftermath of the killing, evidence of recent bruising on Lori's body, and other similar indicia, could nullify any help offered by character evidence, and might well prove disastrous. This, too, according to the findings of the judge, was comprehensively discussed with the appellant before the decision was made to rest, and met with his approval.

Unpub. op. at 9, 1996 WL 75832.

I also vote to affirm the decision of the lower court.